IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. EAGLE ELK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

GUY EAGLE ELK, APPELLANT.

Filed November 1, 2016.    No. A-15-834.

Appeal from the District Court for Scotts Bluff County: TRAVIS P. O'GORMAN, Judge. Affirmed.

William E. Madelung, of Madelung Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, Chief Judge, and PIRTLE, Judge, and MCCORMACK, Retired Justice.

MCCORMACK, Retired Justice.

## I. INTRODUCTION

Guy Eagle Elk was convicted by a jury of aiding and abetting first degree assault. As a result of his conviction, the district court sentenced Eagle Elk to 25 to 30 years' imprisonment. Eagle Elk appeals from his conviction and his sentence. On appeal, he alleges that the district court erred in admitting into evidence a video recording of the attack on the victim; in finding sufficient evidence to support his conviction; and in imposing an excessive sentence. Upon our review, we find no merit to Eagle Elk's assertions on appeal. Accordingly, we affirm his conviction and sentence.

## II. BACKGROUND

The State filed an information charging Eagle Elk with aiding and abetting first degree assault pursuant to Neb. Rev. Stat. § 28-308 (Cum. Supp. 2014) and Neb. Rev. Stat. § 28-206 (Reissue 2008). This charge stems from an incident which occurred late on the night of February 13, 2014 and into the early morning hours of February 14.

Evidence adduced at trial revealed that on the night in question, Dylan Cardeilhac, a 15-year-old inmate who was being held at the Scotts Bluff County Detention Center, lured a corrections officer named Amanda Baker into his cell, wrapped his arm tightly around her throat in a "choke hold," and held her like this until she stopped struggling. Baker ultimately died from the injuries she sustained in the attack.

After attacking Baker, Cardeilhac stole her keys and went across the hall to open the door to another cell. Eagle Elk, who was then 16 years old, and two other inmates were being housed in that cell. Cardeilhac then used Baker's keys to open another cell door. However, Cardeilhac was eventually discovered by corrections officers to be laying on the floor of Eagle Elk's cell in a fetal position.

The State presented evidence at trial which demonstrated that the attack on Baker was part of an escape plan that Cardeilhac had devised with Eagle Elk. The plan involved incapacitating a corrections officer, taking that officer's keys, and unlocking various doors in the detention center. Cardeilhac and Eagle Elk had discussed this plan repeatedly in the days leading up to Cardeilhac's attack on Baker. The evidence revealed that in the hours prior to his attack on Baker, Cardeilhac spent a great deal of time at his cell door communicating with Eagle Elk about the escape plan.

In fact, in a statement to law enforcement personnel, Eagle Elk admitted that on the night of the attack he discussed with Cardeilhac which corrections officer to attack. Eagle Elk told Cardeilhac to "pass out" the officer and demonstrated how to perform a proper choke hold. Eagle Elk told Cardeilhac not to hold the officer for longer than 30 seconds. When Cardeilhac did not attack Baker on two occasions when she entered his cell that night, Eagle Elk threatened, pressured, and provoked Cardeilhac into actually going through with the plan. Eagle Elk repeatedly told Cardeilhac that he "wouldn't do it" and insinuated that Cardeilhac was incapable of executing the escape plan. According to one of Eagle Elk's cell mates, Eagle Elk also told Cardeilhac that if he did not attack a corrections officer that night, Eagle Elk would hurt him the next morning. Eagle Elk then called Cardeilhac a "bitch."

After Cardeilhac attacked Baker and came to Eagle Elk's cell, Eagle Elk decided that he did not want to escape and told Cardeilhac he was "stupid" for hurting Baker. After Cardeilhac was removed from Eagle Elk's cell, Eagle Elk told his cell mates that he was concerned that he could get into trouble for "instigating" the attack on Baker.

At the trial, Cardeilhac testified for Eagle Elk. During his testimony, Cardeilhac denied that Eagle Elk was involved in the attack on Baker in any way. He indicated that although he had spoken with a lot of the juvenile inmates about escaping from the detention center, no one, including Eagle Elk, was aware that he was going to execute his escape plan on the night of February 13, 2014. Cardeilhac also indicated that he learned how to perform a choke hold from one of the employees of the detention center and not from Eagle Elk. Cardeilhac, however, admitted that Eagle Elk did demonstrate a choke hold for him on the night of the attack.

After hearing all of the evidence, the jury convicted Eagle Elk of aiding and abetting first degree assault. The district court subsequently sentenced Eagle Elk to 25 to 30 years' imprisonment.

Eagle Elk appeals his conviction and sentence.

## III. ASSIGNMENTS OF ERROR

On appeal, Eagle Elk assigns three errors. First, Eagle Elk alleges that the district court erred in admitting into evidence exhibit 75, which is a video recording of Cardeilhac attacking Baker. Next, Eagle Elk alleges that there was insufficient evidence to support his conviction for aiding and abetting first degree assault. Finally, Eagle Elk alleges that the district court erred in imposing an excessive sentence.

## IV. ANALYSIS

### 1. ADMISSION OF EXHIBIT 75

Eagle Elk alleges that the district court erred in admitting into evidence exhibit 75, which is a video recording of Cardeilhac attacking Baker. Specifically, Eagle Elk alleges that exhibit 75 was not relevant and that even if it was relevant, its "probative value was outweighed by its prejudicial effect." Brief for appellant at 11-12. Based upon our review of the record, we conclude that the district court did not abuse its discretion in admitting exhibit 75 into evidence.

### (a) Background

On the night of the attack on Baker, there were various security cameras monitoring and recording the inmates and staff at the detention center. In particular, there was a camera recording the "day room" for the "juvenile side of the detention facility." The view from this camera showed the hallway which ran between the cells where the male juvenile inmates were housed. There was also a camera recording in the cell where Cardeilhac was housed. As a part of the State's case, it offered into evidence portions of the recordings from these two cameras from the time leading up to, during, and immediately after the attack on Baker. One such recording, exhibit 75, showed Cardeilhac attacking Baker. In this recording, Baker can be seen kneeling down to look at something in Cardeilhac's cell. As she tries to stand up, Cardeilhac pulls the sleeve of his sweatshirt up, jumps on Baker's back and puts his arm around her neck just beneath her chin. Baker can be seen struggling to pull Cardeilhac's arm away from her neck and trying to get away from him. After a few seconds, Baker falls to the floor with Cardeilhac still on her back and still holding his arm around her neck. She continues to try to wriggle away from Cardeilhac, but ultimately, stops fighting. Cardeilhac continues to keep his arm around Baker's neck for at least another minute after Baker stops moving.

Prior to the start of the trial, Eagle Elk made a motion in limine, arguing that exhibit 75 should not be admitted into evidence. Specifically, Eagle Elk argued that the video recording contained in exhibit 75 was "inappropriate" as it "unfairly prejudices Mr. Eagle Elk because of the shocking nature of the actual video of this woman being attacked and strangled by Dylan Cardeilhac." Eagle Elk offered to stipulate that "Mr. Cardeilhac's attack upon Ms. Baker constituted first degree assault." He then argued that due to this stipulation, there was simply no

need to show the video to prove that the assault had taken place or that the assault was "serious" in nature.

The State argued that exhibit 75 should be admitted into evidence because it was highly relevant to proving the State's case. Specifically, the State argued that it would be offering the recording to show not only that the attack did take place, but also to show the "method" of the attack, which was important to proving Eagle Elk's involvement. The State also argued that Eagle Elk's decision to stipulate to the occurrence of the attack "is not sufficient for the State to prove its case."

The district court overruled Eagle Elk's motion in limine. The court stated its belief that "the State does have a right to show the tape." The court went on to explain its decision:

> I think [the video] is relevant on the method of attack and all the other reasons too. Is it prejudicial? Probably. But is it unfairly prejudicial? I don't think it rises to that level. So I will allow the video being shown.

During the trial, when the State offered into evidence exhibit 75, Eagle Elk renewed his objection to the recording's admission, arguing that "the probative value is outweighed by its prejudicial value." The district court again overruled the objection and the recording was played for the jury.

### (b) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *Id*. Admission of videotapes is also generally within the trial court's discretion, subject to the same requirements for admission of still photographs. See *State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983).

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. See *State v. Freemont*, *supra*.

### (c) Analysis

On appeal, Eagle Elk first asserts that the district court should not have admitted exhibit 75 into evidence because it was not relevant to proving Eagle Elk aided and abetted first degree assault. He asserts that the relevance of the exhibit was particularly tenuous given his offer to stipulate that the assault occurred and that the assault was "serious." Upon our review, we find Eagle Elk's assertion to be without merit. Exhibit 75 was relevant to proving Eagle Elk's guilt.

We first note that a defendant cannot negate an exhibit's probative value through a tactical decision to stipulate. *State v. Freemont*, *supra*. The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing. *Id*. Here, the State chose to present to the jury multiple video recordings of the events at the detention center during the time leading up to, during, and immediately after the attack on Baker. Given this

presentation of video evidence, exhibit 75 was relevant to provide a coherent and complete picture of the events on the night of the attack.

Moreover, as the State argues, exhibit 75 was highly relevant to the State's case because it showed the manner in which Cardeilhac attacked Baker. Specifically, the video showed Cardeilhac attacking Baker using the "choke hold" that was demonstrated to him by Eagle Elk. The video also showed Cardeilhac following the escape plan devised by Cardeilhac and Eagle Elk. Immediately after Cardeilhac incapacitates Baker, he can be seen taking her keys and leaving his cell.

Eagle Elk's offer to stipulate that the attack on Baker occurred did not negate the relevance of exhibit 75. The video was highly relevant to proving Eagle Elk's involvement in the attack and, thus, to proving he was guilty of aiding and abetting first degree assault. We now turn to Eagle Elk's assertion that exhibit 75 should not have been admitted because of its unfairly prejudicial effect on the jurors.

Neb. Rev. Stat. § 27-403 (Reissue 2008), provides, in part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." In the context of this section, "unfair prejudice" means an undue tendency to suggest a decision based on an improper basis. See *State v. Freemont*, *supra*. The district court found that while exhibit 75 was somewhat prejudicial, it did not rise to the level of being unfairly prejudicial. We cannot say that the court abused its discretion in its determination.

Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. See *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994). However, it is only evidence that is "unfairly prejudicial" that should not be admitted into evidence. While we recognize that exhibit 75 is difficult to watch and can be characterized as "gruesome," we also recognize that the exhibit portrays Cardeilhac executing an escape plan that Eagle Elk helped to develop. Eagle Elk encouraged and provoked Cardeilhac into attacking Baker in the very manner that he now argues is too "gruesome" for the jurors to have viewed. As such, it is not entirely clear how this video could have led the jurors to base their verdict on anything other than the actual circumstances surrounding the assault on Baker.

Because exhibit 75 is relevant to proving Eagle Elk's involvement in the attack and demonstrates a coherent picture of the events of the night of the attack, and because it is not unfairly prejudicial, we do not find that the court abused its discretion in admitting the video into evidence.

2. SUFFICIENCY OF EVIDENCE

Eagle Elk next alleges that the State presented insufficient evidence to prove, beyond a reasonable doubt, that he aided and abetted first degree assault. Upon our review, we conclude that the evidence was sufficient to support the conviction.

(a) Standard of Review

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed

most favorable to the State, is sufficient to support the conviction. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

(b) Analysis

Eagle Elk was charged with and convicted of aiding and abetting first degree assault, pursuant to Neb. Rev. Stat. § 28-308 (Cum. Supp. 2014) and Neb. Rev. Stat. § 28-206 (Reissue 2008). Section 28-308 provides, "A person commits the offense of assault in the first degree if he or she intentionally or knowingly causes serious bodily injury to another person." And, § 28-206 instructs that "[a] person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

The Nebraska Supreme Court has further defined "aiding and abetting" an offense to "involve[] some participation in the criminal act [which] must be evidenced by some word, act, or deed." *State v. Schreck*, 224 Neb. 650, 399 N.W.2d 830 (1987) (quoting *State v. Bennett*, 219 Neb. 601, 365 N.W.2d 423 (1985)). However, the court has also stated, "No particular acts are necessary, nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. Mere encouragement or assistance is sufficient." *Id.*

The evidence adduced at trial, when viewed in the light most favorable to the State, demonstrated that in the days preceding the attack on Baker, Cardeilhac and Eagle Elk had developed plans to escape the detention center. As a part of the escape plans, Cardeilhac and Eagle Elk discussed incapacitating a corrections officer by "choking them out" so that they could obtain that officer's keys to unlock various doors in the detention facility.

In the hours before the attack, Cardeilhac informed Eagle Elk that he was planning on executing their escape plan that night. Cardeilhac and Eagle Elk then spent a great deal of time at the doors to their respective cells, talking about the escape plan. During these conversations, Eagle Elk discussed with Cardeilhac which corrections officer to attack and threatened to hit Cardeilhac the next morning if he did not attack the officer that night. Eagle Elk repeatedly provoked and encouraged Cardeilhac by telling him that he "wouldn't do it," that he was not capable of following through with the plan, and calling him derogatory names. In addition, Eagle Elk demonstrated to Cardeilhac the choke hold to use when attacking Baker. Eagle Elk instructed Cardeilhac not to hold her longer than 30 seconds and that if he did the hold correctly, she would not be able to scream. Notably, much of this evidence was corroborated by Eagle Elk, himself, during his interview with police a few days after the attack.

The evidence presented by the State also demonstrated that in the early morning hours of February 14, 2014, Cardeilhac attacked Baker in his cell by using the choke hold Eagle Elk showed him. Baker ultimately died as a result of this attack. We note that there was no evidence to suggest that the escape plans contemplated by Eagle Elk and Cardeilhac involved killing a corrections officer. There was also no evidence that Eagle Elk intended Cardeilhac to kill Baker. However, we must also emphasize that Eagle Elk was charged with and convicted of aiding and abetting first degree assault, not aiding and abetting murder. There clearly is sufficient evidence to find that Baker suffered serious bodily injury, as her injuries ultimately resulted in her death.

The evidence presented by the State, when taken together, established that Eagle Elk agreed to execute an escape plan with Cardeilhac and that this plan involved attacking a corrections officer. The evidence also established that Eagle Elk encouraged Cardeilhac to go through with

- 6 -

the plan and assisted him by demonstrating the choke hold Cardeilhac could use to "pass out" Baker. Cardeilhac then, in fact, attacked Baker. This evidence is more than sufficient to support Eagle Elk's conviction for aiding and abetting first degree assault.

On appeal, Eagle Elk argues that the evidence presented by the State is not sufficient to prove his guilt beyond a reasonable doubt because Cardeilhac's testimony at the trial refuted the State's evidence of Eagle Elk's involvement in the attack and because the evidence demonstrated that Eagle Elk did not actually intend to escape if Cardeilhac went through with his plan.

During the trial, Cardeilhac testified for Eagle Elk. In his testimony, Cardeilhac denied that Eagle Elk was involved in the attack on Baker in any way. Cardeilhac testified that no one knew he was planning on executing his escape plans on the night of the attack. He testified that Eagle Elk never indicated that he would escape with Cardeilhac. He also testified that he asked a staff member of the detention center about how to use a choke hold on someone and how long it takes to "choke someone out." He did, however, admit that on the night of the attack, Eagle Elk demonstrated a choke hold for him from Eagle Elk's cell.

Essentially, Eagle Elk argues Cardeilhac's testimony at trial completely negates the evidence presented by the State concerning Eagle Elk's involvement in the attack on Baker. This argument is really about witness credibility. Eagle Elk is asserting that Cardeilhac's testimony should be believed over all the other evidence presented. His assertion is without merit.

The jury convicted Eagle Elk of aiding and abetting first degree assault despite the testimony of Cardeilhac. Eagle Elk's conviction indicates that the jury did not find Cardeilhac's testimony to be credible, and we, as an appellate court, do not pass on the credibility of witnesses. See *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

Eagle Elk also asserts that because there was evidence to suggest that he did not actually intend to escape, that he cannot be convicted of aiding and abetting the assault which was part of an escape plan. Again, Eagle Elk's assertion is without merit. As we discussed above, there was sufficient evidence presented by the State to establish that Eagle Elk encouraged and assisted with the attack on Baker. He demonstrated the choke hold to use to incapacitate Baker. Eagle Elk's true motives in encouraging and assisting Cardeilhac do not affect his culpability for the crime of aiding and abetting Baker's assault. Whether Eagle Elk actually intended to escape with Cardeilhac does not negate his involvement in Cardeilhac's actions.

### 3. EXCESSIVE SENTENCE

Eagle Elk's final assignment of error is that the district court imposed an excessive sentence. Upon our review of the record, we conclude that Eagle Elk's assertion has no merit. The sentence is clearly within statutory limits, and the court did not abuse its discretion in imposing the sentence.

### (a) Standard of Review

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Balvin*, 18 Neb. App. 690, 791 N.W.2d 352 (2010).

(b) Analysis

Eagle Elk was convicted of aiding and abetting first degree assault, a Class II felony, punishable by one to 50 years' imprisonment. See Neb. Rev. Stat. §§ 28-105 & 28-308 (Cum. Supp. 2014) & Neb. Rev. Stat. § 28-206 (Reissue 2008). The district court sentenced Eagle Elk to 25 to 30 years' imprisonment. This sentence is clearly within the statutory limits.

On appeal, Eagle Elk argues that the sentence imposed by the district court is excessive even though it falls within the statutory limits, because the district court failed to adequately consider his young age and immaturity at the time of the offense and his lack of a "prior adult record." Brief for appellant at 20. Eagle Elk also asserts that the sentence imposed does not reflect his level of culpability in the offense. Specifically, Eagle Elk points to evidence of his belief that Cardeilhac would never actually hurt a corrections officer and his lack of any knowledge about Cardeilhac's desire to kill a corrections officer.

In imposing a sentence, the sentencing court is not limited to any mathematically applied set of factors. *State v. Nelson*, 276 Neb. 997, 759 N.W.2d 260 (2009). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all of the facts and circumstances surrounding a defendant's life. *Id*. In imposing a sentence, a judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Davis*, 277 Neb. 161, 762 N.W.2d 287 (2009).

Contrary to Eagle Elk's assertion on appeal, it is clear that the district court thoroughly and completely considered all of the relevant factors in imposing its sentence, including Eagle Elk's young age, his prior criminal history, and his level of culpability for the offense. In fact, prior to announcing the sentence, the court specifically informed Eagle Elk that it had "considered [his] age, [his] mentality, [his] education, [his] experience, [his social and cultural background, [his] past criminal record, the motivation for the offense, the amount of violence involved in the offense, as well as the letters that I received in support of you."

In its comments at the sentencing hearing, the district court acknowledged Eagle Elk's "young age," but also indicated that despite his age, Eagle Elk had a lengthy criminal history. Specifically, the court stated:

> Mr. Eagle Elk, your criminal record is concerning despite your young age. You have continuously broken the law since 2010. Your crimes range from MIP, vandalisms, trespass, a number of assaultive behaviors.
>
> You have no respect for authority in my opinion as evidenced by crimes such as operating a motor vehicle to avoid arrest and your repeated propensity to abscond from places that you have been sentenced to. I see absolutely no reason that behavior would stop. You commit crimes [while] incarcerated.

The court also noted its concern that Eagle Elk continued to maintain an allegiance to a gang despite the severity of the charge he was facing.

- 8 -

Information in the presentence report supports the district courts comments about Eagle Elk's significant criminal history. While it is true that Eagle Elk does not have a "prior adult record," it is also true that his juvenile record is extensive. His prior offenses include: vandalism; disturbing the peace; criminal trespass; theft by receiving stolen property; third degree assault; operating a motor vehicle to avoid arrest; and shoplifting. As a result of Eagle Elk's juvenile criminal history, he had been committed to the Youth Rehabilitation and Treatment Center in Kearney at least four times prior to the incident which gave rise to his current offense.

In its comments at the sentencing hearing, the district court also thoroughly discussed Eagle Elk's culpability for what happened to Baker. Specifically, the court stated:

> Throughout this case you have attempted to paint a picture of yourself as a victim. Someone being punished for the acts of Dylan Cardeilhac. You are not being punished for the act of Dylan Cardeilhac. I keep hearing nobody thought he would do it. You are not being charged as an accessory to murder. You are being charged as an accessory to the assault. That's what you wanted him to do. That's what everybody told him to do.

> After hearing the evidence and evaluating the witnesses in this case, I can say with extreme confidence that your participation -- without your participation Ms. Baker would be alive today.

> You were the captain of the ship so to speak in that facility. The alpha male that everybody feared, looked up to, wanted to impress. You are the bully that stole everybody's food, threatened them with violence, called them names if you didn't get your way.

> With Dylan Cardeilhac I think you were even more than that. You were a teacher, a mentor. You gave him the tools and the knowledge he needed to do what he did. You taught him the same choke hold that we had to watch on the video that killed Amanda Baker. You taught him the manner in which to perform it, how to stand, where to squeeze, all that stuff. You stayed up all night communicating with him the details of how to do it and encouraging him to do it. You called him your little bitch when he wouldn't do it. You threatened to break his jaw the next morning if he didn't do it. That's what you were convicted of. That's what the jury saw. And that's what I see.

Upon our review of the record, we conclude that there is no indication that the district court failed to adequately review any of the relevant sentencing factors, as Eagle Elk alleges on appeal. To the contrary, we find that the district court thoroughly and completely considered each relevant factor and thoroughly and completely explained to Eagle Elk at the sentencing hearing how each of the relevant factors influenced the court's ultimate sentencing decision. We conclude that given the nature of this offense and Eagle Elk's extensive criminal history, the district court did not abuse its discretion in sentencing him to 25 to 30 years' imprisonment.

## V. CONCLUSION

Upon our review, we affirm Eagle Elk's conviction for aiding and abetting first degree assault. In addition, we affirm the sentence imposed on Eagle Elk as a result of this conviction. We find that the district court did not abuse its discretion in admitting into evidence the video recording of the attack. We also find that there was sufficient evidence to support Eagle Elk's

conviction and that the district court did not abuse its discretion in sentencing Eagle Elk to 25 to 30 years' imprisonment, a sentence which is clearly within the statutory limits.

AFFIRMED.